THOMAS E. MONTGOMERY, County Counsel (SBN 109654)
County of San Diego
By MORRIS G. HILL, Senior Deputy (SBN 97621)
   MELISSA M. HOLMES, Senior Deputy (SBN 220961)
1600 Pacific Highway, Room 355
San Diego, California 92101-2469
Telephone: (619) 531-4860; (619) 531-5836; Fax: (619) 531-6005
E-mail: morris.hill@sdcounty.ca.gov; melissa.holmes@sdcounty.ca.gov

Attorneys for Defendants County of San Diego and Kirk Terrell

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DEBORAH HOOPER, an individual<br><br>　　　　Plaintiff,<br>　　v.<br><br>COUNTY OF SAN DIEGO; SAN DIEGO COUNTY SHERIFF'S DEPARTMENT; SHERIFF WILLIAM B. KOLENDER, in his official and individual capacities; DEPUTY SHERIFF KIRK TERRELL, in his official and individual capacities; DOES 1-10,<br><br>　　　　Defendants. | No. 07cv01647-JAH-KSC<br><br>**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION (ECF No. 401) TO DESIGNATE ADDITIONAL EXPERTS**<br><br>Pretrial Hearing Date: June 15, 2020<br>Time: 2:30 p.m.<br>Dept.: 13B - Courtroom of the Honorable John A. Houston |

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................... -ii-

I.   INTRODUCTION ............................................................................................. 1

II.   LEGAL STANDARD ....................................................................................... 2

III.   PLAINTIFF CANNOT RECOVER DAMAGES FOR HER FOOT INJURY .......................................................................................................... 5

IV.   ARGUMENT ................................................................................................... 10

V.   CONCLUSION .............................................................................................. 14

# TABLE OF AUTHORITIES

**Cases**   **Page(s)**

*Cleveland v. Piper Aircraft Corp*,
   985 F.2d 1438 (10th Cir. 1993) ....................................................................4, 5, 15

*Galdamez v. Potter*,
   415 F.3d 1015 (9th Cir. 2005) ........................................................................ 3, 15

*Hoffman v. Tonnemacher*, No. CIV F 04-5714
   (AWI) (DLB), 2006 WL 3457201 (E.D. Cal. Nov. 30, 2006) ............................ 2, 3, 5

*Hooper v. Cty. of San Diego*,
   629 F.3d 1127 (9th Cir. 2011) .............................................................................. 10

*Little v. City of Richmond*, No. 13-cv-02067-JSC,
   2015 U.S. Dist. LEXIS 21410 *5 (N.D. Cal. Feb. 23, 2015) ....................................... 4

*Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.*,
   195 F.3d 765, n.15 (5th Cir. 1999) ..................................................................... 3, 4

**RULES/STATUTES**

Federal Rule of Civil Procedure 16(e) ......................................................................... 2-3

# I.

# INTRODUCTION

Defendants respectfully offer this opposition to plaintiff's post-trial motion (ECF No. 401) to designate two additional lawyer-hired expert witnesses, Jesse Wobrock and Babak Samini. Ostensibly Wobrock and Samini would testify about plaintiff's foot injury.[1] This appears to be a back-door way to get around the Court's ruling granting a new trial after the defense verdict in the first (2013) trial. When granting plaintiff's motion for new trial, the Court excluded any claim for the alleged foot strike. (ECF No. 169, pp. 4-5.)

It also appears that the real purpose of adding Wobrock and Samini is to attack defendant Terrell's credibility by focusing on plaintiff's foot injury. The Court will recall that defendant Terrell denied deliberately using a heel strike on plaintiff when she escaped his grasp, but could not rule out unintentional contact with her foot.

As will be shown below, Plaintiff did not blame her foot injury on defendant Terrell during discovery, even though the injury was documented in contemporaneous medical records. The foot injury would have been front and center from the very beginning of this case if plaintiff genuinely blamed it on defendant Terrell, or if plaintiff had advanced some kind of provocation theory to try to excuse her own actions.

Plaintiff tries to justify the present motion with counsel's declaration stating (in essence) that he decided to get more experts after talking to jurors after the most recent (third) trial, which resulted in a second hung jury.[2] But plaintiff's counsel cannot plausibly argue that he could not, or should not, have hired these two experts at the outset of the case,[3] or at the latest, during discovery a dozen years ago.

Plaintiff's motion hides the ball by not including the new experts' reports, or detailed summaries of their opinions. Yet it seems clear that the real purposes are to get around

---

[1] At the previous three trials, plaintiff called Dr. Griglak (her emergency room doctor) to testify about her foot injury. Plaintiff does not contend that Dr. Griglak will be unavailable to testify at the upcoming fourth trial.

[2] The first trial ended in a defense verdict; the second and third ended in hung juries.

[3] The underlying incident happened in 2006, fourteen years ago.

- 1 -

07cv-01647-JAH-KSC

the Court's prior ruling excluding any claim based on the alleged foot injury, and to otherwise attack defendant Terrell's credibility. Plaintiff's counsel vaguely declares that Wobrock would testify that "if Deputy Terrell was laying on top of Ms. Hooper as he describes, Ms. Hooper would be unable to move as the deputy states. Nor would it be physically possible for her to grab the deputy's firearm as he claims."[4] ECF Doc. 401-2, 2:23-25. He vaguely declares that Samini would testify that "the only mechanism of injury that explains Ms. Hooper's broken metatarsals is a law enforcement heel strike by Deputy Terrell." ECF Doc. 401-2, 3:9-10.

Trial is set to begin on July 14, 2020 (only two months from now, measuring from the filing of this Opposition) – which is fourteen years after the incident. But the present motion gives rise to the following unanswered questions:

- What specific opinions will plaintiff's new experts offer?
- Should defendants designate new rebuttal experts?
- Will plaintiff oppose designation of rebuttal defense experts?
- Should defendants' present experts be allowed to expand their opinions?
- Will *Daubert*-type motions be needed?
- What foundational facts will the new experts rely on?
- Will additional fact witnesses be needed on foundational facts?
- Will plaintiff's extreme delay unfairly prejudice defendants?

## II.
## LEGAL STANDARD

No reported appellate case sets forth a test for allowing a party to add expert witnesses following a hung jury. Plaintiff cites *Hoffman v. Tonnemacher,* No. CIV F 04-5714 (AWI) (DLB), 2006 WL 3457201, *2 (E.D. Cal. Nov. 30, 2006), a case in which a hung jury was followed by a defendant's motion to amend the pretrial order by, *inter alia,* adding an additional expert witness. The ruling cited Federal Rule of Civil

---

[4] "Grab" the gun is plaintiff's preferred characterization; defendant Terrell testified he felt plaintiff's hand on his gun, but did not see it.

- 2 -

Procedure 16(e), providing that the pretrial order "shall be modified only to prevent manifest injustice." In the *Hoffman* case, the defendant seeking to belatedly add an expert originally relied on discussions with a co-defendant's counsel, from which he incorrectly believed he had a "gentleman's agreement" allowing him to use the co-defendant's experts. The judge allowed the amendment, commenting that the defendant's conduct had not been "advisable," but had not been "willful or in bad faith." *Id.* at *4.

Plaintiff is not moving for modification of the pre-trial order, and has not identified any other source of procedural authority for the leave sought by the present motion. A party moving for a modification of a pre-trial order would have the burden of showing that an amendment is necessary to prevent manifest injustice. *Galdamez v. Potter,* 415 F.3d 1015, 1020 (9th Cir. 2005).

When evaluating whether a party has shown manifest injustice sufficient to justify amendment of a pre-trial order, courts consider four factors: (1) the degree of prejudice or surprise to the non-moving party if the order is modified; (2) the ability of the non-moving party to cure the prejudice; (3) any impact of modification on the orderly and efficient conduct of the trial; and (4) any willfulness or bad faith by the party seeking modification. *Galdamez*, 415 F.3d at 1020.

If a party moving for modification of a pre-trial order knew or should have known (at the time of the pre-trial order) that certain witnesses were necessary, exclusion of those previously-undisclosed witnesses is not manifestly unjust. *Martin's Herend Imports, Inc. v. Diamond & Gem Trading United States of Am. Co.,* 195 F.3d 765, 776, n.15 (5th Cir. 1999). In that case, the appellate court upheld the lower court's decision to properly exclude Diamond and Gem's motion to introduce testimony, in the form of declarations of seven witnesses. *Martin's Herend Imports*, 195 F.3d at 775. The district court excluded the new testimony because the "discovery deadline expired long ago." *Id.* Additionally, Diamond and Gem never formally moved to have discovery reopened, and the court was skeptical that even if filed, it would prevail because it likely would not be

able to demonstrate "manifest injustice." *Id.* Thus, the court held that it did not abuse its discretion "based on Diamond and Gem's post-remand proffering of additional evidence without any explanation of why it did not offer it at the first trial, and based on the injustice that might result for Martin's in having to prepare for this new evidence." *Id*; *e.g. Little v. City of Richmond,* No. 13-cv-02067-JSC, 2015 U.S. Dist. LEXIS 21410 *5 (N.D. Cal. Feb. 23, 2015) (Court denied a party's motion for leave to add two expert witnesses when retrial date had already been set, one of the proposed experts would bring in an entirely novel topic of expertise into the matter, and that party knew or should have known that both proposed experts may have been necessary at first trial).

In *Cleveland v. Piper Aircraft Corp*, 985 F.2d 1438 (10th Cir. 1993), the Tenth Circuit was faced with the question of whether the district court abused its discretion by limiting a retrial to those witnesses and that evidence adduced at the first trial, before appellate remand. The court wrote:

> Our remand for a new trial was not an invitation to reopen discovery for newly retained expert witnesses and to enlarge trial time unnecessarily through the addition of totally new exhibits and testimony. It is always easy in hindsight for counsel to realize there may be a better way to try a case the second time around. Hindsight advantage necessarily inures to both sides, but this does not mean a court, when faced with procedural error, *must* allow either side to introduce totally new expert witnesses to bolster or impeach earlier evidence.

*Cleveland*, 985 F.2d at 1449-50. The Tenth Circuit then went on to discuss the circumstances under which the district might properly choose to allow a party to add new witnesses, particularly expert witnesses to a retrial proceeding:

> The trial court is much more familiar with the conduct of the original trial, the needs for judicial management and the requirements of basic fairness to the parties in a new trial. We do not feel, however, that the trial court's ruling should be inflexible. Clearly, if the trial court perceives in limiting evidentiary proof in a new trial, a manifest injustice, to one side or the other, the court must retain broad latitude and may with proper notice allow additional witnesses and relevant proof. In this regard, if a party makes a timely motion to produce new and material evidence which was not otherwise readily accessible or known, the court should, within the exercise

of discretion, consider whether denial of the new evidence would create a manifest injustice.

*Cleveland*, 985 F.2d at 1449-50.

Significantly, in the *Hoffman* and *Cleveland* cases discussed above, the parties who sought to add new witnesses made showings of manifest injustice. Plaintiff cannot show manifest injustice because her foot injury was duly documented in contemporary medical records, because she did not mention it when asked to describe how the incident happened during her discovery deposition, because her foot injury was not mentioned in her counsel's statement of facts in her opposition to defendants' summary judgment motion, and because her foot injury was likewise not mentioned in the factual summary on appeal, in which the material facts were stated in the light most favorable to plaintiff. Record citations supporting the foregoing assertions are set forth in section III of this brief, below. Manifest injustice does not exist merely because one side's counsel eventually decides "there may be a better way to try a case" and belatedly tries to "plug the holes." *See Cleveland*, 985 F.2d at 1449-50.

### III.
### PLAINTIFF CANNOT RECOVER DAMAGES FOR HER FOOT INJURY

As noted in section I above, this Court excluded any claim for the alleged foot strike after the defense verdict in the first trial. In the March, 2020 (third) trial, this Court correctly instructed the jury (Instruction No. 18) on plaintiff's claim: "in order to prove an unreasonable seizure in this case, Ms. Hooper must prove by a preponderance of the evidence that Deputy Terrell used excessive force *when he caused her to be bitten by his canine."* ECF Doc. 391, 23:8-12, emphasis added.

Back in 2009, defendants moved for summary judgment, which was granted. Plaintiff offered the following fact summary in opposition to that dispositive motion:

> *After Ms.Hooper tried to pull away from Terrill, she went to the ground where she lay proned on her stomach face down,* Terrill on her back with one knee on her back. Terrill was holding both Ms. Hooper's hands behind her as she thought she was about to get handcuffed.

1  ECF Doc. 27, 6:2-5 (emphasis added). Please note that plaintiff's fact summary did *not*
2  assert that her foot was injured at that point, or that defendant Terrell injured it.

3  Plaintiff's opposition to summary judgment also included the paramedic records
4  from her ambulance ride to the hospital, in which there was no mention of a foot injury.
5  See ECF Doc. 27, page 35. Plaintiff's opposition further included emergency department
6  records by Dr. Griglak; those records mention the foot injury, but nothing associating it
7  with the arresting officer. See ECF Doc. 27, pages 36-37. Plaintiff's opposition further
8  included plastic surgeon Dr. Kearney's summary, which also mentioned the foot injury,
9  but again did not associate it with the arresting officer, while noting that plaintiff was
10 combative during medical treatment. See ECF Doc. 27, page 38.

11 Plaintiff's opposition to summary judgment also included lodged testimony from
12 plaintiff's November 25, 2008 deposition. Please note that when defense counsel asked
13 plaintiff to describe what happened between her and defendant Terrell, she did *not*
14 mention anything about her foot injury, and did *not* accuse defendant Terrell of stepping
15 (or stomping) on her foot:
16 ///
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

```
            1    A    Yes.
            2    Q    Okay.  So as you are on the ground with Deputy
            3    Terrell on top of your back, did he tell you at that
            4    point in time that he was placing you under arrest?
12:44:55    5    A    Yes.
            6    Q    Do you recall saying anything to Deputy Terrell
            7    at that point in time as you were first on the ground?
            8    A    No.
            9    Q    When do you recall Deputy Terrell telling you
12:45:42   10    that he was placing you under arrest?
           11         MR. COOK:  You mean at what point in the
           12    sequence that she recalls him saying this?
           13         MS. KISH:  Correct.
           14         MR. COOK:  Okay.  Do you understand the
12:45:51   15    question?
           16         THE WITNESS:  Yeah.
           17         And I do -- I do believe that when he was
           18    jerking my hand, he said, "Hooper, turn around.  You are
           19    under arrest," but I didn't remember that ten minutes
12:46:12   20    ago.
           21    BY MS. KISH:
           22    Q    Okay.  So at the time when he first grabs at
           23    your left arm, that's when he says to you, "Turn around.
           24    You are under arrest"?
 2:46:22   25    A    Yeah.
```

KNIGHT COURT REPORTERS, INC.

42

```
 1      Q    And that's the point this time where you jerk
 2   your hand away from him, correct?
 3      A    He grabbed my hand, and I jerked away, and it
 4   was all -- it was like all in one -- it all happened at
 5   the same time.  It wasn't like he said, "Turn around,
 6   Hooper.  You are under arrest" and grabbed my arm.  It
 7   all -- he grabbed my hand.  I was jerking away as he was
 8   saying it.
 9      Q    Okay.  What's the next thing you recall
10   happening?
11           MR. COOK:  Objection.  Vague.  At what point in
12   time?  I mean --
13           MS. KISH:  The last testimony that we had from
14   Ms. Hooper is when she is on the ground thinking she's
15   about to be handcuffed.
16   BY MS. KISH:
17      Q    What's the next thing you remember happening?
18      A    I remember him screaming, "Get away from my car.
19   Get away from my car.  Come here, Kojo."  And as that was
20   going on, when he was saying, "Get away from my car," I
21   turned up, and I looked at him, and I watched his mouth
22   move.
23      Q    You watched Deputy Terrell's mouth move?
24      A    Yes.
25      Q    And you watched him yell --
```

KNIGHT COURT REPORTERS, INC.

43

- 8 -

07cv-01647-JAH-KSC

> ```
>  1    A    Yes.
>  2    Q    -- "Get away from my car"?
>  3    A    Yes.
>  4    Q    Do you know who the deputy was yelling, "Get
>  5   away from my car" --
>  6    A    The spectators.
>  7    Q    Do you recall there being spectators?
>  8    A    Yes.
>  9    Q    Tell me about the spectators.  What do you
> 10   recall as far as people watching this event?
> 11    A    I can't tell you how many there were.  I
> 12   remember one lady in particular screaming, "Get him off
> 13   of her.  Get him off of her.  He is going to rip her face
> 14   off," and the dog was on me.
> 15    Q    Do you recall approximately how many people were
> 16   there watching?
> 17    A    30, 40, 50.
> 18    Q    And were they mostly in one place, or were they
> 19   in all different areas, or what do you remember about
> 20   that?
> 21    A    In front of the store from one end to the other.
> 22    Q    Okay.  So it's your recollection there were
> 23   anywhere from 30 to 50 people watching these events with
> 24   you and Deputy Terrell from in front of Longs Drug Store?
> 25    A    Yes.  At least 30.  I could be wrong.  40 or 50,
> ```
>
> KNIGHT COURT REPORTERS, INC.                    44

ECF Doc. 27, pages 30-32, November 25, 2008 deposition.

///

After summary judgment was granted, plaintiff appealed to the Ninth Circuit, where the case was fully briefed. The Ninth Circuit appropriately summarized the material facts in the light most favorable to plaintiff, as follows:

> Deputy Terrell then walked with Hooper outside to the parking lot, and Hooper gave him her car keys. Deputy Terrell discovered in the car a crystalline substance he believed to be methamphetamine. *Deputy Terrell then approached Hooper, grabbed her left wrist, and told her she was under arrest for possession of methamphetamine. Hooper jerked her hand away from Deputy Terrell. In the struggle that ensued, Hooper ended up on the ground, lying on her stomach.* Deputy Terrell lay on her back, covering her, with his head pointed in the same direction as hers. Deputy Terrell called for backup using his hand-held radio.
> What happened next is disputed. *Taking the evidence in the light most favorable to Hooper, she struggled briefly with Deputy Terrell after they were on the ground by "jerking side to side."*

*Hooper v. Cty. of San Diego,* 629 F.3d 1127, 1129 (9th Cir. 2011) (emphasis added). Again, please note that the Ninth Circuit's fact summary contains nothing about defendant Terrell stepping or stomping on plaintiff's foot, or being disabled by a foot injury that impaired her ability to struggle on the ground, or put her hand on his gun.

It is far too late for plaintiff's counsel to re-formulate his trial strategy by trying to convince jurors to believe a new version of facts involving a disabling foot injury – a version formulated after this case came back from the Ninth Circuit following appeal.

## IV.

## ARGUMENT

Plaintiff's present motion is not based on any newly-discovered facts or circumstances. Nor does plaintiff need another medical witness to testify about her foot injury – she has Dr. Griglak, who saw her right after the incident, and who testified at all three trials. Apparently plaintiff's problem with Dr. Griglak is that he will not go along with plaintiff's argument that her foot injury had to be caused by someone stepping or stomping on her foot. Specifically, Dr. Griglak testified as follows at the most recent trial on March 5, 2020:

| ECF No. 378 at 2:12-3:1 | Q. IS THE ONLY WAY THAT THAT FRACTURE COULD OCCUR IS FROM SOMEONE STOMPING ON A FOOT?<br>MR. COOK: OBJECTION. BEYOND THE SCOPE.<br>THE COURT: SUSTAINED.<br>Q. BY MS. HOLMES: NOW, YOU'VE TESTIFIED BEFORE REGARDING THIS INJURY; CORRECT?<br>A. YES.<br>Q. AND IN THE PAST, HAVE YOU EVER OPINED ABOUT THE MULTIPLE WAYS THAT AN INJURY LIKE THIS COULD BE CAUSED?<br>MR. COOK: WELL, AGAIN, IT'S BEYOND THE SCOPE.<br>THE COURT: OVERRULED. YOU MAY ANSWER, SIR.<br>THE WITNESS: YES.<br>Q. BY MS. HOLMES: OKAY. AND IS THERE ONLY ONE WAY AN INJURY LIKE THIS CAN BE CAUSED?<br>A. NO. |
|---|---|

Even though plaintiff called Dr. Griglak as plaintiff's witness, plaintiff's counsel did not want the doctor to testify about what mechanisms (in his experience) might have caused plaintiff's foot injury, because he wanted to convince a not-fully-informed jury that the foot injury must have been deliberately inflicted by defendant Terrell.

Plaintiff also called Joel Leguina at all three trials. The Court will recall that he was the only eyewitness who expressed an opinion that defendant Terrell should not have released the dog. But Mr. Leguina did describe plaintiff struggling on the ground, consistent with defendant Terrell's testimony:

| ECF No. 383 at 11:11-20 | Q. AND WHAT WAS SHE DOING?<br>A. JUST NOT ALLOWING THE -- MOVING HER LEGS, MOVING HER HANDS, YOU KNOW, HER WAIST, TRYING TO BASICALLY GET HIM OFF.<br>Q. COULD YOU TELL THAT SHE WAS TRYING TO GET HIM OFF?<br>A. YES.<br>Q. WHAT WAS SHE DOING THAT CAUSED YOU TO THINK THAT SHE WAS TRYING TO GET HIM OFF?<br>A. WELL, SHE WAS BUCKING, TRYING -- MOVING HER BODY UP AND DOWN, HER WAIST, TRYING TO GET HIM OFF. |
|---|---|
| ECF No. 383: 39:20-40:3 | Q. NOW, YOU WOULD AGREE THAT AFTER THE TWO OF THEM WENT TO THE GROUND, MS. HOOPER'S ARMS WERE JUST WILD?<br>A. CORRECT.<br>Q. HER ARMS APPEARED TO BE ALL OVER THE PLACE, FLAILING EVERYWHERE?<br>A. YES.<br>Q. AND YOU WOULD AGREE THAT SHE WAS TRYING TO BUCK THE OFFICER OFF OF HER BACK?<br>A. A. CORRECT. |

07cv-01647-JAH-KSC

Plaintiff also called Jennifer Zabrowski at the most recent trial. She was also an eyewitness; she also testified consistently with defendant Terrell, as follows:

| ECF No. 380 at 10:15-22 | Q. OKAY. AND WHEN YOU SAW HIM ON TOP OF HER WITH HIS LEFT KNEE ON HER BACK, WHAT WAS SHE DOING?<br>A. SHE WAS MOVING HER RIGHT ARM. HE HAD AHOLD OF HER LEFT ARM, SHE WAS MOVING HER RIGHT ARM UP AND DOWN, JUST FLAILING HER ARM AROUND.<br>Q. OKAY. AND COULD YOU TELL WHETHER OR NOT SHE PUSHED HERSELF UP OR TRIED TO MOVE HER BODY IN ANY WAY?<br>A. I DON'T REMEMBER, NO. |
|---|---|
| ECF No. 380 at 34:1-5 | Q. OKAY. SO -- AND ISN'T IT TRUE THAT OTHER THAN USING HER RIGHT ARM TO REACH BEHIND HER AND MAKING NOISES AND YELLING AND SCREAMING, YOU DON'T REALLY RECALL ANYTHING ELSE MS. HOOPER WAS DOING ON THE GROUND?<br>A. THAT IS CORRECT. |

Leon Doyon was another eyewitness. He testified at the 2013 trial, but was unavailable at the two more-recent trials. His pertinent testimony was read to the most recent jury; it was also consistent with defendant Terrell's testimony, as follows:

| ECF No. 371 at pp. 5 – 7 (original transcript pagination 831:23 – 834:14) | Q. AND WHAT DID YOU OBSERVE WHEN YOU GOT OUTSIDE?<br>A. WHEN I -- WHEN I WAS GOING OUTSIDE, I SEEN THAT THE OFFICER HAD MS. HOOPER ON THE GROUND AND MRS. HOOPER WAS PUSHING, PHYSICALLY PUSHING, DOING PUSH-UPS WITH THIS DEPUTY ON HER BACK.<br>Q. WHAT WAS THE RELATIVE SIZE OF MS. HOOPER AND THE OFFICER?<br>A. WELL, THE OFFICER IS -- WAS A LARGER GENTLEMAN. YOU KNOW, HE'S GOOD SIZE IN STATURE. SHE WAS SMALLER, THINNER.<br>Q. OKAY. BUT IT'S YOUR RECOLLECTION THAT MS. HOOPER WAS DOING PUSH-UPS, OR THE OFFICER WAS DOING PUSH-UPS?<br>A. MRS. HOOPER, SIR.<br>Q. OKAY. DID YOU FIND THAT SURPRISING?<br>A. YES.<br>Q. WHAT DID YOU DO?<br>A. WELL, ME, JUST OUT OF NATURAL INSTINCT, I SAW THAT THE -- THE SITUATION COULD HAVE BEEN GETTING OUT OF HAND, AND I WAS GOING OUTSIDE TO HELP THE OFFICER. AND THAT'S WHEN I SAW THE DOG SHOOT ACROSS THE |
|---|---|

PARKING LOT, AND THAT'S WHEN I STOPPED.
Q. NOW, WHEN YOU SAW THE DOG SHOOT ACROSS THE PARKING LOT, ABOUT HOW FAR WERE YOU FROM THE OFFICER AND MS. HOOPER?
A. I WAS PROBABLY ABOUT 40 YARDS, MAYBE.
Q. OKAY.
MR. COOK: I'M SORRY. DID HE SAY 4 OR 40 YARDS?
THE COURT: COULD YOU REPEAT YOUR ANSWER, SIR.
THE WITNESS: I SAID 40. BUT MY EXACT NUMBER, I COULD NOT -- I CAN'T REMEMBER EXACTLY. I DIDN'T HAVE LIKE A TAPE MEASURE OUT THERE TO TELL EXACT DISTANCE.
Q. BY MR. HILL: IN RELATION TO WHERE YOU WERE -- WELL, LET'S BACK UP A LITTLE BIT. WHEN YOU -- DID YOU SEE MS. HOOPER AND THE OFFICER ON THE GROUND?
A. YES, SIR.
Q. AND YOU SAID BEFORE ABOUT THE PUSH-UPS. NOW, WHEN YOU SAW THEM, YOU SAID THAT THE OFFICER WAS ON MS. HOOPER'S BACK; CORRECT?
A. YES, SIR.
Q. NOW, THEIR HEADS ARE BOTH POINTING IN THE SAME DIRECTION, SO TO SPEAK?
A. YES, SIR.
Q. AND WHERE WERE THEIR HEADS POINTING IN RELATION TO WHERE YOU WERE OBSERVING?
A. DIRECTLY TOWARDS ME.
Q. SO AS YOU'RE LOOKING AT THEM, YOU'RE LOOKING AT THE TOPS OF THEIR HEADS?
A. YES, SIR.
Q. COULD YOU SEE OR DID YOU SEE MS. HOOPER'S RIGHT ARM?
A. YES, SIR.
Q. DID YOU SEE MS. HOOPER'S RIGHT HAND?
A. NOT CLEARLY.
Q. DID YOU SEE THE DEPUTY'S HANDS?
A. I -- YOU KNOW, IT'S TOUGH TO SAY EXACTLY WHERE HIS EXACT HAND POSITIONING WAS. BUT I KNOW THAT HE WAS ON TOP OF HER, AND HE WAS TRYING TO GRAB AHOLD AND RESTRAIN HER.
Q. NOW, WHEN YOU SAW THE DEPUTY -- OR WHEN YOU SAW THE OFFICER ON MS. HOOPER, DID HE HAVE HIS ARM AROUND HER NECK?

| |
|---|
| A. NO. IT LOOKED LIKE HE WAS TRYING TO REACH UNDER AND GRAB A HAND.<br>Q. OKAY. WHAT HAND DID HE APPEAR TO BE TRYING TO GRAB, HER RIGHT OR HER LEFT?<br>A. IT LOOKED LIKE -- FROM WHAT I REMEMBER, IT LOOKED LIKE HER RIGHT, RIGHT HAND.<br>Q. DID IT APPEAR TO YOU, BASED UPON WHAT YOU WERE WATCHING, THAT THE DEPUTY AT THAT POINT THAT THEY ARE DOING THAT, HAS CONTROL OVER MRS. HOOPER'S HAND OR HANDS?<br>A. NO, SIR. HE DIDN'T HAVE FULL CONTROL OVER HER. |

Plaintiff's proposed new experts, Wobrock and Samini, would not merely attack defendant Terrell's credibility; they would do the same for quoted eyewitnesses Leguina, Zabrowski, and Doyon by trying to show that plaintiff could not have done some of the things they saw her do. At a minimum, such new opinions would justify a *Daubert*-type motion to test their scientific basis.

The proposed new expert opinions, if allowed, would also justify reconsideration of the Court's previous restriction of testimony by defendants' drug-effects expert Dr. Clark, who originally testified (at the 2013 trial) about assaultive behavior he professionally observed in methamphetamine users such as plaintiff. The new experts would apparently testify that plaintiff's foot injury disabled her from that kind of assaultive behavior. The Court will also recall that Dr. Clark also testified that methamphetamine users are more tolerant to both pain and fatigue. In fairness, Dr. Clark should be allowed to testify to assaultive behaviors he professionally observed in methamphetamine users who should have been disabled by pain and fatigue.

## V.

## CONCLUSION

There are many ways plaintiff's foot could have been injured; Dr. Kearney's medical records reflect that she was combative at the hospital, long after her interaction with defendant Terrell. Lack of reference to a foot injury in ambulance records supports

1. the possibility that her foot was injured at some later point. See ECF Doc. 27, page 35.
2. Lack of information in emergency department records associating the foot injury with the
3. arresting officer supports the possibility that defendant Terrell did not cause it. See ECF
4. Doc. 27, pages 36-37.

     If plaintiff had associated her foot injury with her interaction with defendant Terrell during discovery a dozen years ago, defendants might have had a fair chance to investigate such possibilities. Now, fourteen years after the incident, defendants are severely prejudiced by the passage of time, including the fading memories of any witnesses from that time who might still be available.

     After trying (and failing) to convince three impartial juries to return a plaintiff's verdict, plaintiff's counsel has naturally come to realize that "there may be a better way to try a case," and to try to "plug the holes." *See Cleveland*, 985 F.2d at 1449-50. But plugging holes in this case by hiring two new paid witnesses – experts whom plaintiff could have hired and designated a dozen years ago – to try to sell a new factual scenario undermining the credibility of fact witnesses – fails to overcome plaintiff's burden of proving "manifest injustice." *See Galdamez,* 415 F.3d at 1020. Trials should not be games in which lawyers hire and pay professional witnesses to persuade jurors not to believe the factual testimony of genuine unpaid percipient witnesses. Plaintiff's motion should be denied.

Respectfully submitted,

DATED: May 15, 2020        THOMAS E. MONTGOMERY, County Counsel

By: s/MORRIS G. HILL, Senior Deputy
Attorneys for Defendants County of San Diego and Kirk Terrell
E-mail: morris.hill@sdcounty.ca.gov